# EMERADO FARMERS ELEVATOR COMPANY v. THE FARM-ERS BANK OF EMERADO, a Corporation.

(29 L.R.A. (N.S.) 567, 127 N. W. 522.)

### Corporations — Officer of Two Companies — Defalcation — Officer's Intent to Conceal.

1. In case the treasurer of an elevator company, also acting as cashier of a bank in which the elevator company has money on deposit, and authorized to draw checks in the name of the elevator company upon its bank account for the purpose of paying debts and obligations of the elevator company, misappropriates funds of the bank and for the purpose of covering up a shortage in the bank's funds until such time as he expects to be able to replace the same, draws checks of the elevator company payable to the bank, and charges these checks against the elevator company on the books of the bank, without intention to transfer funds from one corporation to the other, but only for the purpose of temporarily concealing his defalcation, such checks create no liability in favor of the bank against the elevator company.

### Banks and Banking — Cashier's Authority — Notice — Officer of Bank Representing Depositor — Defalcation.

2. In case the cashier of the bank having misappropriated funds of the bank or become in some manner indebted thereto, as treasurer of the elevator company draws checks upon it payable to the bank and uses the same to pay his personal indebtedness to the bank, such checks, by their form, of themselves operate as notice to the bank of a misappropriation of the funds of the elevator company, and the bank, after accepting them with such notice, cannot predicate upon them a claim of liability against the elevator company.

---

Note.—The authorities are not entirely agreed as to whether managing officers of a corporation, through whom alone the corporation can act, are within the exception to the general rule charging a principal with knowledge acquired by its agent, which obtains when the agent is engaged in committing an independent, fraudulent act on his own account. Many cases have applied the exception even when the officer committing the wrongful act was a director, president, or other managing officer. But there is good authority, if not the weight of authority, in favor of a qualification of the exception, so as to exclude therefrom and bring within the general rule which charges the principal with knowledge possessed by the agent, cases where the officer, though acting for himself of a third person, is, as in the case of EMERADO FARMERS' ELEV. Co. v. FARMERS' BANK, intrusted with the entire management of the business, or acts as sole representative of the corporation in the transaction in question. The authorities on this question are reviewed at length in notes in 2 L.R.A. (N.S.) 993, and 29 L.R.A. (N.S.) 558. The doctrine is also discussed in a valuable article by Professor Mechem in 7 Mich. L. Rev. 137, et seq.

**Banks and Banking — Principal and Agent — Ratification — Agent's Acts.**

3. In case the cashier of a bank who has misappropriated its funds or otherwise become indebted to it, in order to conceal his defalcation or pay his indebtedness transfers funds of an elevator company of which he is treasurer, to the bank, and in order to account for such transfer draws checks upon the elevator company payable to the bank, and charges the amount of the same against the elevator company upon the books of the bank, the bank having accepted such payment through its cashier, cannot retain the benefits of his act without accepting the consequences of his knowledge. After receiving funds under such a state of fact, the bank can retain them only through ratification of the fraudulent act of its agent, the cashier; and in doing this it becomes *particeps criminis* with the cashier and liable at the suit of the elevator company to the amount of the fund so fraudulently transferred.

**Banks and Banking — Payment of Trust Funds with Notice of Intended Misappropriation.**

4. A banking institution is not authorized to pay out funds intrusted to it on deposit to a person known by it to stand in a trust relation to the depositor, when it has notice that such person intends to misappropriate and divert the fund received to his own uses when paid over; and in case such payment is made the amount so paid may be recovered at the suit of the depositor.

**Banks and Banking — Cashier's Authority — Notice of Bank — Embezzlement.**

5. In case the cashier of a banking institution who has the entire management, control, and conduct of its affairs, and stands as sole representative of the bank in all transactions relating to the receipt and disbursement of the funds of depositors, who, while so acting, draws checks of an elevator company of which he is treasurer, payable to the bank, presents such checks as treasurer to himself as cashier, takes the sum of money paid over thereon and misappropriates it, the bank of which he is acting will be held to knowledge of his fraudulent purpose at the time of presenting the checks, and cannot base thereon a claim of liability in its favor against the elevator company.

Opinion filed June 28, 1910.

Appeal from District Court, Grand Forks county; *C. F. Templeton,* J.

Action by Emerado Farmers Elevator Company against The Farmers Bank of Emerado, to recover a balance alleged to have been received by it upon deposit. Plaintiff had judgment, and defendant appeals.

Affirmed.

*Bangs, Cooley,* and *Hamilton,* for appellant.

When an agent has been guilty of fraud for his own benefit by which he intended to and did defraud his principal, and possibly others, and the perpetration necessarily involved concealment from his principal, the latter is not chargeable with constructive notice of facts so concealed. 2 Pom. Eq. Jur. § 675; United Secur. L. Ins. & T. Co. v. Central Nat. Bank, 185 Pa. 586, 40 Atl. 97; Benedict v. Arnoux, 154 N. Y. 715, 49 N. E. 326; Produce Exch. & T. Co. v. Bieberbach, 176 Mass. 577, 58 N. E. 162; Knobelock v. Germania Sav. Bank, 50 S. C. 259, 27 S. E. 962; National Bank v. Munger, 36 C. C. A. 659, 95 Fed. 87.

The determination of this case should be controlled by Gunster v. Scranton Illuminating, H. & P. Co. 181 Pa. 327, 59 Am. St. Rep. 650, 37 Atl. 550.

*Scott Rex,* for the respondent.

Bank's knowledge that money paid by it was to be misappropriated would prevent a recovery. Zane, Banks & Bkg. §§ 136, 143; First Nat. Bank v. New Milford, 36 Conn. 93; Manhattan Bank v. Walker, 130 U. S. 267, 32 L. ed. 959, 9 Sup. Ct. Rep. 519; Lamson v. Beard, 45 L.R.A. 822, 36 C. C. A. 56, 94 Fed. 30.

Notice to its cashier is notice to the bank. Chase v. Redfield Creamery Co. 12 S. D. 529, 81 N. W. 951; Willard v. Monarch Elevator Co. 10 N. D. 400, 82 N. W. 996; Sykes v. First Nat. Bank, 2 S. D. 242, 49 N. W. 1058; Wyckoff v. Johnson, 2 S. D. 91, 48 N. W. 837; Stebbins v. Lardner, 2 S. D. 127, 48 N. W. 847; Union Nat. Bank v. Moline, M. & S. Co. 7 N. D. 211, 73 N. W. 527; Farmers' & T. Bank v. Kimball Mill. Co. 1 S. D. 388, 36 Am. St. Rep. 739, 47 N. W. 402.

Where the cashier is the sole managing agent, his knowledge is the knowledge of the bank that he represents. First Nat. Bank v. New Milford, 36 Conn. 93; Morris v. Georgia Loan, Sav. & Bkg. Co. 109 Ga. 12, 46 L.R.A. 506, 34 S. E. 378; Wiggins v. Stevens, 33 App. Div. 83, 53 N. Y. Supp. 90; Daniels v. Empire State Sav. Bank, 92 Hun, 450, 38 N. Y. Supp. 580; National Bank v. Munger, 36 C. C. A. 659, 95 Fed. 87; Holden v. New York & E. Bank, 72 N. Y. 286; Atlantic Cotton Mills v. Indian Orchard Mills, 147 Mass. 268, 9 Am. St. Rep. 698, 17 N. E. 496; First Nat. Bank v. Dunbar, 118 Ill. 625, 9 N. E. 186; First Nat. Bank v. Blake, 60 Fed. 78; Niblack v. Cosler,

74 Fed. 1000; Bolles, Bkg. § 14, pp. 416 & 422; Hobbs v. Boatright, 195 Mo. 693, 5 L.R.A.(N.S.) 906, 113 Am. St. Rep. 709, 93 S. W. 934; Cook v. American Tubing Co. 28 R. I. 41, 9 L.R.A.(N.S.) 193, 65 Atl. 653.

ELLSWORTH, J.   The complaint in the action in which this appeal is taken alleges that respondent, who is a corporation engaged in the grain elevator business at the village of Emerado, North Dakota, had carried for two years and more prior to the beginning of the action, an open account on deposit with appellant, which was, during that period, engaged in a general banking business at the same place; that during said period appellant had paid out for respondent on checks drawn on its said account portions of its moneys, and that at the beginning of the action there still remained to respondent's credit the sum of $3,044.02, which balance was payable on demand; that demand had been duly made and payment refused.   The answer of appellant admits the allegation of an open account on deposit by respondent, but denies that there remains a balance of such deposit to respondent's credit in any sum whatever; and further alleges, as a counterclaim, that during the continuance of the account between appellant and respondent as aforesaid, appellant honored checks of respondent duly issued by it to an aggregate amount of $3,257.97 in excess of all sums received from respondent, by deposit or otherwise; and prays judgment for the recovery of the amount of such overdraft in the sum alleged.

By undisputed facts shown upon the trial, it appears that on June 19th, 1907, there stood to respondent's credit on the books of appellant bank a balance of $6,660.98; that between that date and October 3d, 1908, there were further sums deposited by appellant, which, including such balance, aggregated the sum of $146,682.49; and that during said period there was paid out for respondent upon checks duly drawn and presented to appellant sums aggregating $143,638.47, leaving a balance of $3,044.02, the sum for which suit is brought.

It further appeared that at all times from the fall of the year 1905 until his death by suicide, on or about the first day of October, 1908, one John Hempstead was secretary and treasurer of respondent corporation, and as such had authority, and it was a part of his official

duties, to receive its moneys and deposit them with appellant to respondent's credit. It also was his duty as treasurer of respondent upon presentation to him of proper vouchers therefor to pay its debts and obligations, and he was duly authorized to draw checks upon respondent's bank account with appellant for that purpose.

It also appeared that from December, 1902, until the time of his death, Hempstead was one of the directors and cashier of appellant bank. On August 15th, 1907, Hempstead, as treasurer of respondent Elevator Company, drew two certain checks, one in the sum of $2,000 and the other in the sum of $1,768, on which checks appellant, under the designation of "Farmer's Bank," was named as payee, and on August 17th, 1907, charged the amount of said checks against respondent's account on the books of the bank. On May 8th, 1908, Hempstead, as treasurer, drew another check for the sum of $2,333.99, in which also appellant was the payee named, and on May 9th charged that sum against respondent upon the books of the bank. All three of these checks bear the bank's stamp, "paid" upon their face as of the date of their issuance. On the quality of these three checks depends the entire issue between appellant and respondent in this case. If they were properly chargeable against respondent's account, then the claim of the Elevator Company against appellant is fully paid, and appellant is entitled to recover as an overdraft the amount prayed for in its counterclaim. On the other hand, if the checks are worthless and their aggregate amount is not a legitimate charge against respondent, appellant concededly is indebted to it in the amount claimed in its complaint.

It was shown to have been the usual practice of Hempstead during the period that he was acting as treasurer for respondent to receive over the counter of the bank grain tickets issued by the operating agent of the Elevator Company at Emerado, and to pay them in cash with the moneys of the bank. During these seasons of the year when grain was being marketed in considerable quantity, a number of such tickets would be presented in the course of a day; and at the close of the day's business in order to adjust accounts between the Elevator Company and the bank, Hempstead would draw a check for the aggregate amount of the tickets issued during the day, payable to the bank, and sign the same as treasurer of the Elevator Company. A large number of

checks drawn in this manner were shown upon the trial. It appears, however, that the three checks in question, although drawn in the same form as the others, were not placed by Hempstead with the checks of the Elevator Company, but were kept in a separate drawer, and were not noted by him in any manner upon respondent's books of account. The existence of these checks was therefore unknown to the Elevator Company until after Hempstead's death and a consequent examination of the bank's books and papers.

It further appeared at the trial that at the time the three checks in question were drawn, marked paid and charged against the Elevator Company upon the books of the bank, there was no indebtedness due from the Elevator Company to the bank in that sum or in any sum whatever. It also appeared that after the time of Hempstead's death, upon an examination of his account with the bank, there was a cash shortage of $800 or more; that false certificates of deposit aggregating several hundred dollars had been issued by Hempstead to certain depositors. Shortages and irregularities also appeared in the accounts with other banks during the period in which Hempstead was cashier, and in his account with a school district, of which he was treasurer. During his lifetime these shortages were covered by false entries or by some means not clearly shown, which prevented their disclosure upon the books of the bank. It seems apparent from the facts shown that for a period of at least two years before his death, Hempstead had dealt fraudulently with several of the different funds intrusted to him, and manipulated his accounts in such manner as to present a fair showing while he misappropriated and used for his own benefit very considerable sums.

Upon the trial appellant introduced the testimony of Hempstead's successor, as cashier, to the effect that so far as shown by the books and papers of the bank it had received no benefit from the three checks issued by Hempstead and charged against respondent's account upon its books; that the books of the bank, at the dates on which these entries were made, balanced exactly, a status that would not have existed if the cash account of the bank was intact at those dates and had been increased by the receipt of the amount of money shown by the checks or of any sum whatever. It also appeared that at all times prior to October 1st, 1908, the books of the bank at such times as a balance was

taken gave no indication of any irregularity or shortage in the bank's funds. An expert accountant who examined the books of the Elevator Company in October, 1908, testified that the Elevator Company had received no consideration or value whatever for the three checks in question. There was also some testimony that, according to a business custom prevalent in business circles in Emerado, checks drawn in the name of the bank were paid to those presenting them in cash and charged upon the books in the same manner as checks drawn by depositors to the order of cash.

The trial court found the facts generally as hereinbefore narrated, and deduced therefrom a conclusion of law that appellant was indebted to respondent in the sum of $3,044.02, for which sum judgment was entered accordingly. Appellant's principal assignments of error are directed against the findings of the trial court, holding that a balance upon deposit was still due respondent.

Therefore, aside from certain objections made upon the trial to the introduction of evidence, which will be referred to hereafter, the point upon which the entire controversy hinges is whether or not the three checks aggregating $6,101.99 were properly chargeable against respondent. If it be held that these checks are a valid charge against respondent, then it is quite apparent not only that respondent's entire deposit had been paid out to it, or on its order, but that it is liable to appellant for the sum paid in excess of such deposit as shown by the counterclaim.

The dual relation of Hempstead to this transaction in its various incidents is, of course, the only factor which complicates and renders at all uncertain or doubtful the determination of the controlling points of this appeal. If respondent and appellant in their dealings had been represented by different agents, the solution of the question of liability by the application of well-recognized principles would be direct and simple. The meager showing of the evidence throws little light upon the ultimate actual disposition by Hempstead of the sum of money represented by the aggregate amount of the three checks or the fund from which it was drawn; so that these facts are left almost entirely to speculation and surmise. It would seem that neither appellant nor respondent received any benefit whatever from whatever transfer of funds is represented by the passage of these checks. The most

probable view is that the money was misappropriated and used by Hempstead for his personal benefit. It is suggested by appellant's counsel that the capacity in which Hempstead was acting at the time of the misappropriation is the determining factor of the question presented. It is doubtless true that this is a point deserving consideration. However, it rests almost wholly in inference from the facts shown. The inferences that may legitimately be drawn from these facts are somewhat various, but, as we view it, any state of fact that may reasonably be said to exist under the proofs produced comes necessarily within the limits of one or the other of the following hypotheses: (1) Hempstead, having applied to his own use funds of the bank in his hands as cashier in the aggregate amount shown by the three checks, drew the checks and charged them against the Elevator Company on the bank's books, for the purpose of covering up the shortage in the bank's funds until such time as he expected to be able to replace the funds so used by him; (2) Hempstead, being indebted to the bank in the aggregate sum shown by the amount of the checks, gave to it in payment of his personal debts checks signed by him as treasurer upon funds belonging to the Elevator Company; (3) Hempstead, as cashier of the bank, having misappropriated at different times its funds to the aggregate amount of these checks, actually transferred to the funds of the bank those of the Elevator Company in his charge as treasurer, and in order to account for such transfer drew and charged the three checks as shown by the evidence; and (4) Hempstead as treasurer of the Elevator Company, at a time when the Elevator Company owed no indebtedness to the bank, as treasurer of the Elevator Company drew checks payable to the bank, presented these checks to the bank through himself as cashier, received the money in cash and misappropriated it.

From the fact that all moneys belonging to the Elevator Company, under the control of Hempstead, were at all times involved in this transaction on deposit with appellant, it follows that only under the last hypothesis could he be said to have actually misapplied these funds while acting as treasurer of the Elevator Company. His opportunities for fraudulent manipulation of these funds as cashier of the bank were, therefore, more numerous than when acting in the other capacity, and the consequent temptation to misappropriation much stronger. While,

under the conditions of the hypothesis 4, it is possible that when handling the funds as treasurer of the Elevator Company he may have made the actual misappropriation, still it seems to us that the occurrence of such condition is less probable than any of the three others.

If, under the conditions of hypothesis 1, the checks were issued and used by Hempstead merely as a temporary fraudulent cover for the misappropriation of bank funds, it seems quite clear that the bank can make no claim to any benefit from a contract based upon the checks. In preparing the checks with such purpose in view, it cannot reasonably be claimed that Hempstead had any intention that they should in fact operate as a transfer of the funds of the Elevator Company to the bank. As he acted only as treasurer of the Elevator Company in preparing and handling the checks, there was no meeting of minds between it and the bank in a contract operating to transfer the funds. In such state of fact, there is no support to a claim of liability in favor of the bank against the Elevator Company for any of the sums of money designated in the checks. First Nat. Bank v. New Milford, 36 Conn. 93.

Under hypothesis 2, it is readily apparent that a transfer by means of such checks and the application of the funds of the Elevator Company to the payment of the private debt of Hempstead would, of itself, operate as notice to the bank of a misappropriation. The bank, taking the checks under such conditions and with such notice on principles so elementary that demonstration is superfluous, could not predicate upon them a claim of liability against the Elevator Company.

The facts of hypothesis 3 are analogous in every way to those presented in cases where one person takes the property of another and uses it as a means of liquidating his debt to a third person. In such case, the third party, taking the benefit with notice of the fraud out of which it proceeds, cannot retain it without becoming *particeps criminis* with the person committing the fraud. Whether the transfer of funds from the Elevator Company to the bank was made simply upon the books of account or by manual transfer of bills, notes, or coin, the benefit conferred thereby must necessarily have been accepted for the bank by Hempstead, its cashier. "It must be deemed to have known what he knew, and it cannot retain the benefit of his act without accepting the consequences of his knowledge. . . . [It] cannot obtain greater

rights from his act than if it did the thing itself, knowing what he knew." Atlantic Cotton Mills v. Indian Orchard Mills, 147 Mass. 268, 9 Am. St. Rep. 698, 17 N. E. 496. Therefore, the bank, in receiving the funds under a state of fact such as this, acquired no title to them, and can retain them only by rectifying the fraudulent act of its agent. In doing this it would, of course, become liable at the suit of the Elevator Company, to which the fund fraudulently transferred, belonged.

Hypothesis 4, the last in order and the one which, as we have noticed, is most improbable of occurrence, is also the most difficult of determination. The controlling principle is that a banking institution is not authorized to pay out funds intrusted to it by deposit to a person standing in a trust relation to the depositor when it knows such person intends to misappropriate and devote the fund to his own uses when paid over. It is argued by respondent that, if Hempstead as treasurer of the Elevator Company presented these checks to Hempstead as cashier of the bank, and he, acting in the latter capacity, paid over the money to Hempstead as treasurer, who thereupon misappropriated it, the party paying the money, being the same person who received it, must necessarily have knowledge of what he intended to do with it in his other capacity; and therefore that the cashier of the bank knew at the time he paid out the Elevator Company's money that the agent to whom he paid it meant to turn it to his personal uses. The general principle underlying this proposition of law is formulated by our Code as follows: "As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought in good faith and the exercise of ordinary care and diligence to communicate to the other." Rev. Codes 1905, § 5782. But, appellant contends that Hempstead, being merely the agent of the bank and engaged in a fraudulent transaction which rendered it against his interest to disclose his knowledge as treasurer of the Elevator Company to the executive officers of the bank, could not be presumed to have made known these facts. Cases are cited in which the principle is so applied to facts that are very closely analogous to those of the case at bar. Innerarity v. Merchants' Nat. Bank, 139 Mass. 332, 52 Am. Rep. 710, 1 N. E. 282; Gunster v. Scranton Illuminating, H. & P. Co. 181 Pa. 327, 59 Am. St. Rep. 650, 37 Atl. 550. These cases, however, are

distinguished from the case at bar in that the officers of the bank, having knowledge of an intended fraudulent diversion of the funds intrusted to it, did not control its action. Such control was exercised by other persons representing the corporation with equal or greater authority, to whom the knowledge of the person who intended to make the misappropriation was not conveyed. In the case at bar the evidence shows quite satisfactorily that none of the stockholders of the bank except Hempstead was resident in the territory adjacent or tributary to the village in which the bank was located. The entire management, control, and conduct of the affairs of the bank was committed to Hempstead. He had an assistant whom he himself employed, but who was unknown to the officers of the bank and who had not the slightest control of the bank's affairs. There was not the slightest oversight or control over Hempstead exercised by any officer of the corporation. This, as we view it, places the bank under plenary responsibility for the acts of Hempstead, and binds it entirely to notice of any fact that he had in mind when he performed any of the acts committed to him in disbursing the funds of the bank. In any event, the rule above referred to, that the principal cannot take the benefit of the transaction conducted by its agent ostensibly on its behalf without assuming full responsibility, not only for his acts, but his knowledge, applies with all its force. Niblack v. Cosler, 74 Fed. 1000. Under the facts of hypothesis 4, therefore, Hempstead, as principal and sole agent of the bank, necessarily had knowledge at the time he paid the three checks drawn in the name of the Elevator Company, that the agent of the Elevator Company to whom it was paid meant to use the cash for his own benefit. In other words, the bank had full knowledge of the fraud which the agent of the Elevator Company intended to perpetrate, and in paying out the money it was *particeps criminis* in the fraud, and could not recover upon the checks received by it in such transaction. In any practicable view of the circumstances attending the misappropriation of funds by Hempstead in any capacity in which it was possible that he should have acted, there was no liability of the Elevator Company to the bank on any of the three checks in question, and the conclusions of the trial court are fully sustained.

The evidence received by the trial court under objection was all directed to the point that the Elevator Company had no knowledge of or

notice of any irregularities on the part of Hempstead in his dealings with its funds, and on the other hand had every reason to believe that he was at all times conducting the business of the Elevator Company in a regular and methodical manner. While such evidence is not very material, we cannot say that its reception was in any manner prejudicial to appellant. It seems to have been offered in an attempt to forestall certain matters of defense that were not afterward presented, to the effect that certain questionable acts of Hempstead were ratified and approved by tacit acquiescence on the part of the Elevator Company. The objections to these items of evidence were, we think, properly overruled.

As our conclusion upon the legal principles governing the case agree in result with the findings of the trial court, the judgment is affirmed.

All concur, except MORGAN, Ch. J., not participating.