## HARPER v. MERCHANTS' & PLANTERS' NAT. BANK OF MT. VERNON et al.

### No. 4471.

Court of Civil Appeals of Texas. Texarkana.
Feb. 1, 1934.

Rehearing Denied Feb. 8, 1934.

cashier of the bank to purchase for his ward's estate United States Liberty bonds to the amount of $2,500; that the cashier purchased the bonds, and the guardian as such paid "the bank" therefor through a check drawn by him against the deposit account of the funds of the estate; that the guardian, upon paying for the bonds, did not take over the same, but left them in the bank in possession of the cashier to be kept in the bank vault for him as guardian for safekeeping merely, and to be returned to him when he should require it; that the bank provided and maintained, in connection with the banking business, a safety vault for use by general depositors free of charge to store valuables for safe-keeping merely. It appears from the undisputed evidence in relation thereto by necessary inference, as a matter of pure fact, that the cashier of the bank by intention and purpose was acting at the time for and in behalf of the bank in receiving and placing the bonds of the guardian in the bank for safe-keeping merely.

It is clear from the facts stated that the Liberty bonds were the absolute property of the estate of the ward of which appellant was the duly appointed and qualified guardian. The bank had no lien upon them or special property in them. They were not deposited or held as security for or in connection with any business transaction of the bank as a banking corporation, either present or prospective. It was a simple delivery of the particular government bonds to be kept for the guardian as such as the proper legal custodian thereof without recompense, and to be returned when the true legal owner or holder entitled to possession should require it. This is the legal definition of a naked bailment. 3 R. C. L. § 187, p. 560; Shouler on Bailments, pp. 55–57; Kegan v. Park Bank, 320 Mo. 623, 8 S.W.(2d) 858, 15 S.W. (2d) 333; Thornton v. Bank (Tex. Civ. App.) 252 S. W. 278. The mere fact that the guardian was a general depositor in the bank would not, as is made clear in the cited cases, determine the character of the bailment to be that of one for hire rather than gratuitous. The transaction by which the guardian claims that the bank had become a bailee of the government bonds being wholly with the cashier of the bank, an officer of the bank, the effect to charge the bank would rest entirely upon his power in that direction. The rule is general and uniform, limiting the responsibility of corporations for the acts of their officers and agents, in the absence of express authority to do the particular act, to those performed in the discharge of their

Clark, Harrell & Clark, of Greenville, for plaintiff in error..

R. T. Wilkinson, Jr., of Mt. Vernon, and Lawther, Cox & Cramer, of Dallas, for defendants in error.

LEVY, Justice (after stating the case as above).

The first and principal point for decision is that of whether or not the alleged transaction was in the circumstances a bailment to the bank as such, imposing a relation of duty or trust in respect to the bonds and with legal responsibility for their loss.

The material facts affirmatively appear without dispute that the guardian, a general depositor in the bank, requested the

ordinary duties in the usual course of business, and within the sphere and scope of such duties. The power to bind the corporation can only be presumed to exist in its officers and agents within the scope of its ordinary business and their ordinary duties or the incidental powers of the corporation. 3 Tex. Jur. § 37, p. 422; 2 Clark & Skyles on Agency, § 209, p. 497; 7 C. J. § 646, p. 783. Cashiers of banks are duly authorized agents for the transaction of such business as pertains to their office. Receiving deposits is peculiarly the business of cashiers. By the National Bank Act the powers of the defendant bank are confined and limited to banking powers only with such incidental powers as shall be necessary to carry on the business of banking. 12 U. S. Code Ann. § 24, p. 13; Logan County Nat. Bank v. Townsend, 139 U. S. 67, 11 S. Ct. 496, 35 L. Ed. 107; California Bank v. Kennedy, 167 U. S. 362, 17 S. Ct. 831, 42 L. Ed. 198; Commercial Nat'l Bank v. First Nat'l Bank, 97 ″ex. 536, 80 S. W. 601, 104 Am. St. Rep. 879. And it may be deemed to be settled that the receipt of "special deposits," within the scope and meaning of the term, is within the powers of a national bank. 12 U. S. Code Ann. § 133, p. 252; First Nat. Bank v. Graham, 100 U. S. 699, 25 L. Ed. 750. As defined in Tuckerman v. Mearns, 49 App. D. C. 153, 262 F. 607, 610: "A special deposit implies the custody of property without authority in the custodian to use it, and the right of the owner to receive back the identical thing deposited." Quoting from 3 R. C. L. 522, as to a special deposit: "The relation created is that of bailor and bailee, and not that of debtor and creditor." The phrase "special deposits" has been held to embrace bonds of the United States. First Nat'l Bank v. Graham, 100 U. S. 699, 25 L. Ed. 750; Whitney v. First Nat'l Bank, 154 U. S. 664, 14 S. Ct. 1215, 26 L. Ed. 212; and other state cases. The handling and receiving for special deposit of United States bonds and public securities may in their very nature come, or partially come, within the regular line of banking business. National banks have uses for government bonds. And it is profitable to banks to be the custodian of their depositors' government securities. The interest coupons of such bonds are the subject-matter of deposit in the bank as money, and is incident to the banking business. Therefore there cannot properly be any controversy, but that, if the taking of the bonds to safely keep, as they were taken by the cashier, was within the corporative business of the bank, then the effect would be to make the bank the de-

pository of them, subject to the liabilities of that relation. The transaction on the part of the bank was not ultra vires, and was not one which the bank as such had no authority to undertake to perform. The receiving of the bonds for safe-keeping merely was within the sphere and scope of the duties of the cashier as such, and was a transaction in which he had authority to undertake to perform for the bank as such. The evidence is without conflict that the guardian "did not deliver those bonds to Mr. Moore (the cashier) for safe keeping" but he "left them in the bank for safe keeping," and that "they were not kept in Mr. Moore's (cashier) private box," and they were not kept "in your (appellant) private box." Appellant clipped the interest coupons twice from the bonds, and each time "Mr. Moore (the cashier) would get them" from the vault for appellant. Therefore there cannot properly be any controversy, as it appears as a fact without dispute that the cashier did put and keep the bonds in the vault of the bank, as the guardian expected he would, and that the cashier did so, not individually, but as an official for and in behalf of the bank as such. In such facts it could not be held, as claimed by the appellee bank, that the cashier was the guardian's agent in putting the bonds in the vault, and that they were there in possession and in charge of the guardian's agent and at the guardian's risk, inasmuch as the cashier was not himself individually and distinctively apart from his official duties receiving and handling the bonds for safe-keeping.

 A bailment of the bonds to the bank as such, through the cashier acting for and in behalf of the bank, having been established, it became the duty of the bank to observe and respect the bailment and not misuse or fail to seasonably return them when demanded. 5 Tex. Jur. § 18, p. 1029. In the claim of failure of the duty of the bailee bank and that a loss was caused by misuse and want of care, proof was offered to show the fact and manner of the loss. It was shown conclusively that in the fall of 1930 the guardian wrote a letter to the cashier requesting the return to him of the three bonds, and the $500 bond was delivered, but the other two were never returned. That, as shown by the records of the bank, on November 13, 1930, the cashier, in order to protect an overdraft caused by charging to his account two checks of Mrs. Seay each in the sum of $600, took one of the $1,000 liberty bonds in the vault for safekeeping and belonging to the guardianship and placed it in the note case of the bank, which contained and held assets of the bank as such, and

at the same time gave his personal account at the bank credit for $1,000 in reduction of the overdraft charge to his account. That, as shown by the records of the bank, on November 18, 1930, the cashier took $1,000 in cash out of the money belonging to the bank as such, and took the other $1,000 Liberty bond there in the bank vault belonging to the guardianship, and placed it in the note case of the bank, which contained the assets of the bank as such including the other $1,000 Liberty bond. That the cashier attached to each bond, when placed in the bank's note case, a yellow slip of paper with the words "subject to be redeemed on payment of four and a quarter per cent by May 1st," meaning May 1, 1931. Under the circumstances stated, there has been established in favor of the estate of the guardianship the liability of the bailee bank for the value of the bonds which have been lost to the estate. There are the factual elements of a proper and timely request by the guardian of the estate of the lunatic for the return of the three bonds in bailment to the bank as such, and the delivery of one of the bonds, and the failure to return the other two. That the cashier of the bank had subsequently taken the two bonds from their place of special deposit with the bank, and placed them with the general securities and assets of the bank in the purpose of a pledge to secure the transfer of funds of the bank to him, and his personal indebtedness. That, although the cashier in placing the two bonds with the assets of the bank did so with the purpose to subserve simply his own personal interest, yet he wrote plainly on each bond the words indicative of what he had done in his behalf of "subject to be redeemed on payment of four-and-a-quarter per cent by May 1st." Clearly there was a misuse and detention of the two bonds, as against the estate of the lunatic. It is evident that the placing of the bonds with the assets of the bank and pledging them as security for personal indebtedness of the cashier due to the bank was a use of the bonds in a manner not contemplated by the parties to the bailment. The cashier nor the bank as such had been given no authority to do so. The guardian did not know of, or acquiesce in, such use of the bonds at the time. And the placing of the bonds with the general assets of the bank and with the notation thereon of the words mentioned would of itself operate as notice to the bank of an act inconsistent with the bailment and of a misappropriation. The special deposit being in the first instance by the guardian of the estate of an insane person, and the bank having constructive notice thereof, the bank could not take the bonds, as done, as a pledge of security for debt of either the guardian personally or any other person. Moore v. Hanscom, 101 Tex. 293, 106 S. W. 876, 108 S. W. 150. The estate of the lunatic, and the guardian of his estate for him, would be entitled to have the bonds redelivered, notwithstanding they were pledged to the bank by its cashier to secure his private indebtedness. Foster v. City of Longview (Tex. Com. App.) 26 S.W.(2d) 1059. As between the bank as such and the estate of the lunatic, the uses of the bonds in bailment, no authority being given to do so, would ordinarily constitute the bank a wrongdoer, guilty of conversion. 5 Tex. Jur. § 18, p. 1029. The dual relation of the cashier, W. J. Moore, to this transaction stated, and the capacity in which he was acting at the time of such misuses may not be deemed a factor even rendering uncertain and doubtful the solution of the question of liability of the bank. For in the evidence it is shown without dispute that he did not conceal or disavow what he had done in his behalf. He not only noted on the bonds the words mentioned, but also, as shown by the further proof, when called on by the new cashier, his successor in the office, in a few weeks afterwards, in December, 1930, for an explanation respecting the bonds, he stated that the bonds had been pledged to the bank to be redeemed with interest on the principal by May 1st, next. The new cashier in December, 1930, saw the two bonds with the notation thereon in the note case of the bank along with the securities and other assets of the bank. The inference may legitimately be drawn, and is the most probable view, that shortly afterwards the cashier had knowledge or notice that the former cashier himself and for his own personal benefit had pledged the two bonds to the bank to secure payment of his personal indebtedness to the bank. For it is shown that on May 1, 1931, or about that date, the new cashier, acting in behalf of the bank, demanded of the former cashier the redemption of the two bonds. A well-recognized exception to the general rule that a principal is chargeable with the knowledge acquired by his agent exists where the officer of the bank is personally interested in a transaction to which the bank is also a party in interest. Pomeroy, Eq. Jur. (3d Ed.) § 675; Teagarden v. R. B. Godley Lbr. Co., 105 Tex. 616, 154 S. W. 973. The reason for the exception is that the officer will not be presumed to impart knowledge which is adverse to his own interest. In truth in the present case no other officer of the bank except Cashier W. J. Moore had anything to do with or knew about such

dealings with the bonds by W. J. Moore. But the application of the principle may not be made to the present case in view of the circumstances stated, evidencing timely notice by May 1, 1931, to the new cashier acting as an officer and in behalf of the bank, of such personal dealings of the former cashier, W. J. Moore, with the two bonds. The bonds at the time were in the possession of the bank. The new cashier was an entire stranger to the particular transaction in its origin and in nowise at any time had any personal interest whatever in it. It could not be assumed that he would not impart his knowledge and communicate the fact in controversy to the proper bank officials. Therefore the information of the new cashier acquired as such about the personal dealing of the former cashier with the two bonds can be and would be imputed to the bank; the bank at the time being in actual and timely possession of the two bonds. As applicable to the entire facts of the case and sufficient is the quotation from First Nat'l Bank of Monmouth v. Dunbar, Adm'r, 118 Ill. 625, 9 N. E. 186, 188: "Although, in the mere act of purchasing the bonds, Hubbard was the agent of Byers, when the purchase was complete that agency ended. As cashier, in receiving the bonds on special deposit, he was the agent of the bank; and it was as cashier and agent of the bank that, to hide, in part, his embezzlement from the bank, he took the bonds from the special deposit, and placed them among and reported them as assets of the bank. His knowledge was its knowledge, and it could not in this way acquire a legal title to the bonds without the knowledge or consent of Byers."

The doctrine that a bank whose officer fraudulently appropriates funds of a third person and uses them in settlement of his own overdrafts against the bank is liable to the party defrauded is supported by the weight of authority. Knobley Mountain Orchard Co. v. People's Bank, 99 W. Va. 438, 129 S. E. 474, 48 A. L. R. 459; Emerado Farmers' Elevator Co. v. Farmers' Bank, 20 N. D. 270, 127 N. W. 522, 29 L. R. A. (N. S.) 567; Lowndes v. City Nat'l Bank, 82 Conn. 8, 72 A. 150, 22 L. R. A. (N. S.) 408; Mays v. First State Bank (Tex. Com. App.) 247 S. W. 845.

 It is the rule that evidence of a demand and refusal or failure is sufficient to throw upon the bailee the burden of showing the absence of any fault or negligence on his part, and of showing why he should not deliver upon demand. 5 Tex. Jur. § 29, p. 1029. The remaining question, then, is that of whether or not there is exculpatory evidence, having the legal effect to justify the bank and to deny a right of action to the estate of the

insane person. The circumstances in that respect are that in May, 1931, after the time marked for the redemption of the two bonds, and after the cashier demanded of W. J. Moore the redemption of the two bonds, W. J. Moore, acting through J. T. Harper, arranged with the Liberty State Bank to loan him the sum of $2,000, with the two bonds as collateral, to pay over to the appellee bank; that W. J. Moore drew a draft on the Liberty State Bank in favor of the appellee bank for $2,000, and directed the cashier of the appellee bank to attach the two bonds to the draft and send it to the Liberty State Bank for collection, which was done, and the draft was paid and appellee bank received the proceeds of the draft. Neither the bank nor the estate of W. J. Moore has accounted to the estate of the lunatic for the two bonds or their value. In such facts the conclusion, upon legal principles governing, would follow that the bank was not justified in parting with the possession of the two bonds. The cashier of the appellee bank having full knowledge at the time, and his knowledge being legally imputed to the bank, that the former cashier intended to use the two bonds for his individual benefit as collateral to his personal note made to the Liberty State Bank, then, in surrendering the two bonds to be attached to the draft on the Liberty State Bank under such conditions and with such notice in the purpose of receiving the money, the appellee bank would be deemed to be a participant and aiding in the misuse of the two bonds. In doing this the appellee bank would become liable to the estate of the lunatic, suing for the loss. The bank, in taking the proceeds of the draft, and in applying them in cancellation of the claim against the former cashier, has profited by the misuse of the two bonds, at least to the extent of the interest paid on the amount of such claim charged for its use. On principles elementary a national bank receiving benefits therefrom may not plead an ultra vires act or contract of its officer, even should it be held ultra vires. Logan County Nat'l Bank v. Townsend, 139 U. S. 67, 11 S. Ct. 496, 35 L. Ed. 107; Citizens' Central Nat'l Bank v. Appleton, 216 U. S. 196, 30 S. Ct. 364, 54 L. Ed. 443, and other cases. A national bank may plead its own want of power and assert the nullity of an act of its officer or employee only in case the bank has received no benefit at all therefrom. First Nat'l Bank v. Hawkins, 174 U. S. 364, 19 S. Ct. 739, 43 L. Ed. 1007; California Nat'l Bank v. Kennedy, 167 U. S. 362, 17 S. Ct. 831, 42 L. Ed. 198. Even though Mr. Harper may have consented for the former cashier to take the two bonds and use them for his personal benefit as he did with the

Liberty State Bank, the bank, with notice of such situation and intended use, may not, in the absence of an order of the probate court, predicate upon such act exculpation from any fault or neglect attending the misappropriation. For, as above stated, the pledge of the two bonds was not authorized as security for either the guardian personally or any other person. Moore v. Hanscom, supra. And, notwithstanding the pledge to secure the private indebtedness of the former cashier, the estate of the lunatic would be entitled to have the bonds back. Foster v. City of Longview, supra. There can be no valid sale or pledge of personal property of a lunatic, as truly as that of a minor, except by authority of the probate court having jurisdiction of the estate. Gillespie v. Crawford (Tex. Civ. App.) 42 S. W. 621; Browne v. Fidelity & Deposit Co. of Maryland, 98 Tex. 55, 80 S. W. 593.

The conclusions above upon the legal principles governing the case result in reversing the judgment and here rendering judgment in favor of the guardian against the defendant in error bank and the estate of W. J. Moore, deceased, jointly and severally, and in favor of the defendant in error bank over and against the Ætna Casualty & Surety Company upon its fidelity bond, for the sum of $2,000, with legal interest thereon from May 1, 1931. That the estate of the lunatic may have recourse on the guardian and his sureties does not interfere with the prosecution of this suit. Hampton v. Hampton, 9 Tex. Civ. App. 497, 29 S. W. 423; Browne v. Fidelity & Deposit Co., supra. The plaintiff in error to recover costs of appeal and trial court against the defendant in error bank and the defendant in error bank over and against the Ætna Casualty & Surety Company.

The judgment is reversed and rendered.