Norman **HIRSCHKORN**, Leon Bellmore, Robert Koering, and Electrical Builders, Inc., Plaintiffs and Appellants,

v.

Wesley N. **SEVERSON**, Defendant and Appellee.

Civ. No. 10104.

Supreme Court of North Dakota.

May 17, 1982.

Garry A. Pearson, of Pearson & Christensen, Grand Forks, for plaintiffs and appellants.

P. W. Lanier, Jr., of Lanier, Knox & Olson, Fargo, for defendant and appellee.

VANDE WALLE, Justice.

Norman Hirschkorn, Leon Bellmore, and Robert Koering are the majority stockholders and directors of Electrical Builders, Inc. These gentlemen and Electrical Builders, Inc., brought an action against Wesley N. Severson, a stockholder and retired director of Electrical Builders, Inc., seeking to establish the existence of an oral contract for the sale of Severson's stock upon retirement. Severson filed a counterclaim, in equity, seeking payment of dividends for the two preceding years. The trial court ruled that there was no oral contract and dismissed the action. The court found in favor of Severson on the counterclaim, holding that he is entitled to $95,374.56 as his share of the profits of Electrical Builders. The court awarded prejudgment interest at the rate of 10 percent. This appeal followed. We affirm the judgment as modified.

I

In 1959, George Hilstad and Wesley Severson formed Electrical Builders, Inc., an electrical construction business. Norman Hirschkorn, Leon Bellmore, and Robert Koering were employed as electricians. Through the gradual issuance of stock, these three men became part-owners of the corporation. A five-year stock distribution plan, formulated on January 8, 1968, envisioned the following distribution of stock: Severson and Hilstad: 52 percent; remaining stockholders: 48 percent. On the same day a resolution pertaining to the book value of the corporation's stock was passed:

> "Be it further resolved that by means of judicious management of the corporation business, every effort shall be made to maintain the Book Value of issued shares of stock at approximately $250 per share."

On June 1, 1968, the members of the corporation entered into a stock-purchase agreement. This agreement, which provides for the purchase of the shares of a deceased stockholder, also gives the corporation the pre-emptive right to purchase the shares of any stockholder who "desires to dispose . . . of his stock during his lifetime."[1] The agreement contains a clause which states that all prior agreements among the parties respecting the stock of the corporation are revoked.

The book value of the corporate stock was maintained at $250 per share, and at the end of the "five year" period[2] the ownership of Electrical Builders was as follows:

| | |
|---|---|
| Koering | 110 shares |
| Bellmore | 110 shares |
| Hirschkorn | 110 shares |
| Severson | 180 shares |
| Hilstad | 180 shares |
| Sandness | 20 shares |
| | 710 shares |

When Arnold Sandness retired in 1974 he sold his stock to the corporation at book value. Hilstad, on his retirement, wrote a letter to the corporation offering his stock for sale, first to the corporate entity and,

---

1. The clause states, in pertinent part:

   "9. *Sale of Stock During Lifetime.* In the event that any Stockholder desires to dispose of any part or all of his stock during his lifetime, he shall first offer the stock for sale to the Corporation pursuant to Section 3 of Article IV of the By-Laws of Electrical Builders, Inc., and the procedures therein outlined shall be followed. . . ."

2. The option was extended for an additional year because of a lean year.

alternatively, to appellants Hirschkorn, Koering, and Bellmore.[3] The corporation declined Hilstad's offer and his stock was sold to Hirschkorn, Koering, and Bellmore at book value, i.e., $250 per share.

Wesley Severson retired from active service in the corporation in December 1978 and from the board of directors on July 9, 1979. On May 14, 1980, the corporation informed Severson that it was "[exercising] its right to acquire [his stock]" at $250 per share. After Severson's refusal to sell his stock, the corporation created an escrow account and deposited $49,442.08 therein. Upon advice of counsel, the corporation paid no dividends for the fiscal years ending March 31, 1980, and 1981. Rather, the corporate directors distributed the profits via salary increases, bonuses, and benefits totaling $365,700. (The corporation reported as income $245.09 for fiscal year 1980 and $1,379.94 for fiscal year 1981.)

Hilstad, the retired founder and director, testified that he and Severson had discussed the sale of stock upon retirement "numerous times." He also referred to January 1968 as the date an agreement on the matter was reached. He said that the "gentlemen's agreement" referred to in his letter of retirement [see fn. 3], is the "agreement

we talked about every year when we kept the book value down to $250 a share, when we retired we would sell the stock at book value to the corporation . . ."

The gist of Hirschkorn's, Bellmore's, and Koering's testimony is that there were "discussions" concerning the sale of stock upon retirement and that an agreement was reached wherein Hilstad and Severson agreed to sell their stock at book value upon retirement. The board of directors' meeting on January 8, 1968, was cited as the date of these discussions, although Koering also testified that the agreement was mentioned in subsequent years.

Severson stated that he had never entered into a contract to sell his stock at retirement. He testified that all the business of the January 1968 meeting was accurately recorded in the minutes. No contract providing for the sale of stock at retirement was recorded. A letter from Severson to the corporation's bonding company was received into evidence.[4]

An additional document, a memorandum written by an official of the bonding company, was received into evidence. The official, discussing a meeting with Hilstad, wrote: "George said that they had intentionally kept the corporate net worth down

---

3. Hilstad wrote:

"At the last annual meeting of our Board of Directors I announced that it was my intention to retire from Electrical Builders, Inc. in one year's time. That year has passed rapidly. Therefore, in accordance with Section 3, Article IV of the Corporate By-Laws and our stock purchase agreement dated May 5, 1961 as amended, I offer 180 shares of Electrical Builders, Inc. stock to the Corporation at the book value of $250.00 as determined by the corporation accountant on the close of our Fiscal Year business March 31, 1977.

"As an alternate method of selling this stock and in accordance with our long standing gentlemen's agreement between Mr. Severson, Myself, and the junior members of the corporation, wherein the junior members have been permitted to gradually obtain greater share of corporate equity, I would agree to the following:

"If the directors should decline to purchase my shares as corporate stock, I would then agree to sell this stock at the same stated book value. Sixty shares of stock each to

Norman Hirschkorn, Robert Koering, and Leon Bellmore."

4. The relevant portion of Severson's letter states:

"I have no plans on changing [my active participation in the company] prior to December 25, 1978 when I will be 65 years of age. At that time, we may consider my taking a lesser day to day interest, but will retain my shares in the company if required for bonding purposes. Needless to say, all bidding will receive my attention as long as I am involved financially.

"Mr. Hilstad retired effective March 31, 1977 and his stock was purchased by the three minority stockholders. They paid him from their personal assets. This represented a very low value for the stock as equipment is carried at far below its actual value and no consideration is given to income based on investment. *This was in accordance with our 'Buy-Sell Agreement' and the same consideration will be given the balance of the stock in the event any of us leaves the company.*" [Emphasis added.]

to make it easier for the younger members of the firm to purchase stock and that ultimately these younger members would own the corporation at the point that George and Wes chose to retire.[5]

The nub of this controversy is the existence of an oral contract requiring Severson to sell his stock at book value upon his retirement. The trial court found that "there was never any oral agreement between the parties hereto."

■ The burden of proof rests on one who seeks to have a contract specifically performed to establish the terms of the contract upon which he relies. *Rieger v. Rieger*, 175 N.W.2d 563 (N.D.1970). The existence of a contract is a question of fact for the trier of fact. See *Tallackson Potato Co., Inc. v. MTK Potato Co.*, 278 N.W.2d 417 (N.D.1979); 17A C.J.S. *Contracts* § 611. Accordingly, appellate review of this determination is governed by the "clearly erroneous" standard of Rule 52(a), N.D.R.Civ.P.

The oral evidence considered by the trial court consisted essentially of the appellants' assertions that the parties had entered into an oral contract providing for the sale of stock upon retirement and the appellee's contention that no such contract existed. The appellants did not specify an exact date on which the alleged oral contract was made; "January 1968," "January 8, 1968," and "numerous occasions" were all referred to as the occasions for making or confirming the contract. The testimony describing the oral contract does not clearly identify the alleged offerees; both the corporation and the shareholders are mentioned as potential buyers.

The relevant documents received at trial and relied on by the appellants are: (1) Hilstad's letter offering the stock to the corporation and, alternatively, to the junior members [see fn. 3]; (2) Severson's letter to the bonding company [see fn. 4]; and (3) the memorandum written by the official of the corporation's bonding company.

■ The documents do not provide direct evidence of the alleged oral contract. The inferences which could reasonably be drawn from the documentary evidence are not incompatible with Severson's testimony denying the existence of an oral contract. For example, different inferences regarding the existence of an oral contract can reasonably be drawn from Hilstad's retirement letter. The corporate bylaws and the stock-purchase agreement dated June 1, 1968, provide that any stockholder who "*desires*" to sell his stock during his lifetime must first offer the stock to the corporation. Hilstad's offer giving the corporation the right of first refusal is as consistent with a nonobligatory sale in accordance with these provisions as it is with an offer made under the alleged oral contract. The mention of a "long-standing gentlemen's agreement" does not convince us that the trial court was mistaken in finding that no oral contract existed. In both common and legal parlance, a "gentlemen's agreement" refers to an "unsigned and unenforceable agreement made between parties who expect its performance because of good faith." Black's Law Dictionary, 5th Ed. 1979, p. 618.

Likewise, Severson's letter to the bonding company is susceptible of differing interpretations. After discussing the purchase of Hilstad's stock at a "very low value," Severson wrote: "This was in accordance with our 'Buy-Sell Agreement' and the same consideration will be given the balance of the stock in the event any of us leaves the company." [See fn. 4.] Severson testified that this sentence means that he would think about selling his stock at a "very low value." The appellants argue that "even a grade school student" would gather that Severson meant that he would sell his stock on the same terms as did Hilstad.

■ Under Rule 52(a) the resolution of conflicting testimony and the evaluation of the witnesses' credibility is for the trial court. See Wright & Miller, *Federal Prac-*

---

5. We note the probable "hearsay within hearsay" question raised by this evidence. We de-cline to address it, however, because the parties have not raised the question on appeal.

*tice & Procedure*: Civil § 2586. As we explained in *Hoge v. Burleigh Cty. Water Management Dist.*, 311 N.W.2d 23, 28 (N.D. 1981), in summarizing the rules which govern our review of the trial court's findings:

> "The trial court's findings are to be given the same weight as a jury verdict and, in reviewing those findings, the evidence must be viewed in a light most favorable to the findings. *Eakman v. Robb*, 237 N.W.2d 423, 429 (N.D.1975). On appeal it is not the function of this court to substitute its judgment for that of the trial court. *Rolfstad v. Hanson*, 221 N.W.2d 734, 737 (N.D.1974). We must give due regard to the opportunity of the trial court to judge the credibility of witnesses, and, unless clearly erroneous, the findings of fact of the trial court, sitting without a jury, are binding upon appeal. *Tower City Grain Co. v. Richman*, 232 N.W.2d 61, 65 (N.D.1975). Questions of fact decided by the trial court upon conflicting evidence are not subject to reexamination by this court. *Bladow v. Bladow*, 249 N.W.2d 917, 920 (N.D.1977). The mere fact that we might have viewed the facts differently if we had been the initial trier of the case does not entitle us to reverse the lower court. *In re Estate of Elmer*, 210 N.W.2d 815, 820 (N.D.1973)."

Under these guidelines we are bound to hold that the trial court's finding that no oral contract existed is not "clearly erroneous."

Hirschkorn, Bellmore, and Koering recognize that the trial court's findings "come here well armed with the buckler and shield of . . . [Rule] 52(a)." *Horton v. U. S. Steel Corp.*, 286 F.2d 710, 713 (5th Cir. 1961). Nevertheless, to support their position that the trial court was mistaken, they rely on the rule that the review of documentary evidence is not limited by Rule 52(a). *Olson v. Peterson*, 288 N.W.2d 294 (N.D.1980); *Dolajak v. State Auto. & Cas. Underwriters*, 252 N.W.2d 180, 182 (N.D.1977). This is a correct statement of a general rule of law. Its application in this case, however, has not convinced us that a mistake has been made.

▮ As noted above, the documents alone did not prove the existence of an oral contract; their evidentiary worth was dependent upon the explanations offered by the witnesses at trial.[6] The oral testimony and the attendant appraisal of credibility were critical to the interpretation of the documentary evidence. In this situation the clearly erroneous standard applies in full force. Having carefully reviewed the entire evidence, we are not convinced that the trial court was mistaken in finding that no oral contract existed.[7]

## II

▮ In his counterclaim against Hirschkorn, Bellmore, and Koering, Severson sought judgment for his share of the profits of Electrical Builders for the two fiscal years preceding the lawsuit. The trial court held that the three men breached

---

**6.** The presence of testimony recounting the "discussions" does not convince us that the trial court was mistaken in finding that no oral contract existed. The trial court found that "any discussions relating to the sale of . . . Severson's stock at his retirement were prior to the written buy-sell agreement . . . of [June 1, 1968]." This finding is not clearly erroneous in view of the testimony naming January or January 8, 1968, as the date of the alleged oral contract. As noted above, all "previous agreements among the parties respecting the stock of the corporation" were revoked by the stock purchase agreement of June 1968. Even if the evidence of the January 1968 discussions proved the existence of an oral contract, the revoking provision in the June agreement would defeat its operation.

**7.** The statute-of-frauds question was raised by members of this court during oral argument. Severson raised this affirmative defense in his answer, as required by Rule 8(c), N.D.R.Civ.P. The trial court, however, made no ruling on the question. It is well settled that an issue not considered by the trial court cannot be raised for the first time on appeal [*Moran v. Moran*, 200 N.W.2d 263 (N.D.1972)], and we adhere to this rule in this case. For authorities discussing the question of whether or not the sale of the stock of a closely held corporation is governed by the statute-of-frauds provisions of the Uniform Commercial Code [§ 41–02–08, N.D. C.C. (sale of goods), and § 41–08–35, N.D.C.C. (sale of securities)], see 4 A.L.R.4th 912 and 21 A.L.R.3d 964.

their fiduciary duty to Severson, as a minority stockholder, by failing to pay dividends, and awarded Severson judgment in the amount of $95,374.56. The judge awarded interest at the rate of 10 percent on the judgment from the date the dividends should have been paid. The question of the allowability of interest is not before us; it appears that the award of interest is authorized under both Sections 32–03–04 and 32–03–05, N.D.C.C. Rather, we must consider whether or not the award of interest at the rate of 10 percent was proper. The statutes authorizing interest are silent regarding the rate that is to be awarded. See Sections 32–03–04 and 32–03–05. Section 47–14–05, N.D.C.C., however, specifies that "[i]nterest for any legal indebtedness shall be at the rate of six percent per annum unless a different rate . . . is contracted for in writing." The purport of the statutory language is clear: In the absence of a specific contractual rate of interest, prejudgment interest must be calculated at the prescribed legal rate. See, generally, *Murray v. Holiday Rambler, Inc.*, 83 Wis.2d 406, 265 N.W.2d 513, 529 (1978).

Citing *Klitzke v. Klitzke*, 308 N.W.2d 385, 390 (N.D.1981), Severson contends that the trial court is empowered to award a rate of interest higher than the legal rate where equity requires it. In *Klitzke*, a divorce action, the appellant contended that the trial court erred in ordering him to pay interest at the rate of 7 percent per annum (in equal amortized payments) on the unpaid balance awarded the appellee as part of her share of the couple's property. The appellant argued that the interest award was in direct conflict with the statute, which sets the legal rate of interest at six percent per annum. Sec. 47–14–05, N.D.C.C. We disagreed, and held that the statute "is not a limitation upon the court's authority to make an equitable distribution of property in a divorce case." *Klitzke, supra*, 308 N.W.2d at 390.

We do not, however, view *Klitzke* as authority for the proposition that the trial court, in this or any other action deemed equitable, has discretion to award prejudgment interest at any rate it selects. The trial court's authority to award interest at a rate higher than the legal rate, *in distributing the property of a divorced couple*, stems from Section 14–05–24, N.D.C.C. That section empowers the trial court, in a divorce action, to "make such equitable distribution of the real and personal property of the parties as may seem just and proper, . . ." The rate of interest on a cash settlement, along with other methods employed by the court in dividing property, facilitates the equitable division of marital property.

Authorization of the interest rate awarded in this action would set a precedent for the variation of interest rates according to the denomination of the case as equitable or legal. In addition to the apparent unfairness of such a precedent, the difficulties inherent in distinguishing between legal and equitable actions are well documented. See, e.g., *Landers v. Goetz*, 264 N.W.2d 459 (N.D.1978); *Ziebarth v. Kalenze*, 238 N.W.2d 261 (N.D.1976). In view of the fact that the going rate of interest is well in excess of 10 percent, we are not without sympathy for the contention that an interest award at the legal rate smacks of inequity. In the absence of statutory authorization for a flexible rate of prejudgment interest, however, we are constrained by Section 47–14–05, N.D.C.C., to hold that the legal rate applies.

Accordingly, we remand the case to the district court with instructions that the judgment be modified to award interest at the legal rate of six percent per annum. The judgment in all other respects is affirmed.

ERICKSTAD, C. J., PEDERSON and SAND, JJ., and SCHMALENBERGER, District Judge, concur.

SCHMALENBERGER, District Judge, sitting in place of PAULSON, J., disqualified.