GRAVEL PRODUCTS, INC.,
Plaintiff and Appellant,

v.

NESHEM–PETERSON, INC.,
Defendant and Appellee.

Civ. No. 10300.

Supreme Court of North Dakota.

June 24, 1983.

McGee, Hankla, Backes & Wheeler, Minot, for plaintiff and appellant; argued by Russel G. Robinson, Minot; appearance by Orlin W. Backes, Minot.

Pringle & Herigstad, Minot, for defendant and appellee; argued by Jan M. Sebby, Minot.

ERICKSTAD, Chief Justice.

This is an appeal by the plaintiff, Gravel Products, Inc. (Gravel Products) from a judgment of the District Court of Ward County, dated July 30, 1982, dismissing on its merits and with prejudice Gravel Products' breach of contract action against the defendant, Neshem-Peterson, Inc. (Neshem). We affirm.

This controversy relates to the construction of a sunflower processing plant at Velva by Midwest Processing Company. Daniel Construction Company contracted to be the designer-builder or prime contractor for the plant. Neshem ultimately received a subcontract from Daniel Construction Company to provide class 13 road gravel and free drain sand for site preparation and a subcontract from Collins Construction Company to supply concrete aggregate for the project. Prior to receiving written contracts to supply these materials, Neshem sought and received bids from various contractors to supply these materials to Neshem. During August, 1980, Neshem informed Fisher Sand and Gravel (Fisher) that it had submitted the lowest bid and that Neshem anticipated Fisher would receive a contract to supply the materials if Neshem received subcontracts on the project.

On September 9, 1980, Harley Neshem, secretary-treasurer for Neshem, was approached by William Schriock, president of Gravel Products, who informed him that Gravel Products "was very interested in doing some of the work on the project." Harley responded that he didn't have any objection to having Gravel Products participate. A discussion between Schriock and Donald Jablonsky, general superintendent for Fisher, immediately followed whereby they tentatively agreed that Gravel Products would pay Fisher $30,000.00 for the right to supply to Neshem the materials which Fisher had anticipated supplying to Neshem. Harley Neshem, Jablonsky, and

Schriock agreed to discuss the afternoon's conversations with their associates and to communicate by telephone later that evening. The ensuing telephone conversation is the occurrence through which the dispute on this appeal arose. Gravel Products asserts that during the telephone conversation Neshem entered a binding oral agreement to purchase materials from Gravel Products. Neshem asserts there was no commitment to purchase materials from Gravel Products.

During October, 1980, Neshem entered a contract with Lindteigen Construction Company to supply the materials Neshem ultimately needed to complete its subcontracts on the project. Gravel Products then commenced this action seeking damages against Neshem for breach of an oral contract. The district court determined that the telephone conversation on September 9, 1980, constituted "negotiation in the direction of an offer" but that there was no mutual consent to enter a binding purchase agreement. Accordingly, the district court entered its judgment dismissing the breach of contract action on its merits from which Gravel Products has filed this appeal. On appeal, Gravel Products asserts that the district court erred in its determination that there was no oral contract.

■ The determination of whether or not the parties' agreement or agreed-to terms meet the criteria necessary to be declared a valid contract is a question of law which is fully reviewable on appeal. *Gulden v. Sloan,* 311 N.W.2d 568 (N.D.1981). However, the determination of whether or not the parties have mutually consented to enter into an oral contract is a question of fact which will not be set aside on appeal unless it is clearly erroneous under Rule 52(a), N.D.R.Civ.P. *Gulden, supra; Hirschkorn v. Severson,* 319 N.W.2d 475 (N.D. 1982). In *Gulden,* we stated:

"Section 9–03–01, N.D.C.C., provides that the consent of the parties to a contract must be free, mutual, and communicated by each to the other. In deciding whether or not the parties consented to entering into a contract we must look to the actions of the parties at the time, and after the agreement was made. To do so, we must rely on the evidence and the trial court's findings of fact. In reviewing the trial court's finding of fact, we apply the 'clearly erroneous' rule of 52(a), N.D.R.Civ.P." 311 N.W.2d at 571.

One significant factor relied on by the district court in determining that Neshem and Gravel Products did not enter a binding purchase agreement during the telephone conversation is that the parties were aware that Neshem did not have any contracts with the prime contractors to supply materials for the project and that Fisher had not received either a written contract or an oral notice to proceed from Neshem to supply materials. It is undisputed that during August, 1980, Harley Neshem informed Jablonsky that Neshem did not have a written contract and did not have a "verbal agreement" either. There is a dispute, however, regarding a subsequent communication. Jablonsky testified that on September 3, "Harley called and gave us notice to proceed on September 4, 1980." Harley Neshem testified to the contrary that he never gave Fisher a notice to proceed on the project and that a representative of Fisher "asked if they could move in. I said it was their option. They could move in if they wanted to, but that if we didn't have a contract we couldn't authorize them to proceed."

In support of its assertion that Neshem did enter a binding agreement during the telephone conversation, Gravel Products refers this Court to testimony of Harley Neshem whereby he concedes that he reluctantly agreed to Gravel Products' quote on price and quantities. The relevant portion of that testimony is as follows:

"A There was talk of prices and quantities. I recall saying that we had an ambiguous quantity in a railroad ballast and that the ballast was an important part of the conversation.

"Q Uh-huh.

"A I also advised them that I had been unable to make contact with my partners.

"Q Did they go through each one of the quantities and prices with you?

"A Yes.

"Q And what happened, then, when they quoted these? Did they ask you for an agreement as to those?

"A Yes. They asked me for an agreement on price and quantities.

"Q And did you agree on that?

"A I would have to say I agreed reluctantly, not having the benefit of counsel with my partners."

In support of Neshem's position that it did not commit itself to purchase materials from Gravel Products, Harley Neshem testified that during the discussions on September 9, 1980, he informed all parties that he had no contract and was only negotiating to put together a bid:

"Q And did you inform all of these parties that you were negotiating with them and that you had no contract and that you were only putting together a bid promise?

"A Yes.

\* \* \* \* \* \*

"Q (By Mr. Sebby, continuing): Did you understand at the time of your negotiations that you were putting together a bid proposal and that you were not making any firm commitments to Fisher or to Gravel Products in the absence of a contract in your own hands to provide the materials to others?

"A That's right. I tried to make everyone aware that I didn't have a contract in hand and that, you know, without me having a contract I couldn't therefore pass something on that I didn't have."

In essence, the district court found that Harley Neshem agreed during the telephone conversation to various quantity and price estimates as a basis for Gravel Products' submission of an offer to supply materials but that there was no mutual consent to commit Neshem to purchase materials from Gravel Products. Relative to that de-termination, the district court concluded in its written memorandum opinion:

"None of the parties were neophytes in the construction industry. Schriock knew that, as a sub-contractor, Neshem-Peterson did not yet itself have a contract. He certainly knew that a tentative commitment on all of the essential terms was necessary from Gravel Products or other suppliers before Neshem-Peterson could itself enter into an agreement with Daniel."

Another factor relied on by the district court in determining that there was no oral contract is that the parties were unable to agree on payment terms or on specifications for the railroad ballast.

Gravel Products sent Neshem a letter, dated September 12, 1980, "to confirm the conversation ... on 9 Sept. 1980." With regard to payment, that letter provided: "Pay in full in 1980 including stockpiled material" with "no retainage." In response, Neshem sent a letter to Gravel Products, dated September 18, 1980, requesting new price quotes and stating that payment would be made for materials as they were used, that there would be no payment for material stockpiled off site, and that there would be a "10% retainage." Noting that it was faced with conflicting evidence on the payment issue, the court stated in its memorandum opinion:

"Harley Neshem testified that payment was to be due Gravel Products upon receipt of payment by Neshem-Peterson. The September 12 letter required payment in full in 1980 for all materials including those which would be stockpiled at the point of production.

\* \* \* \* \* \*

"On cross-examination, Jablonsky testified that generally a subcontractor does not get paid until the contractor is paid, ... The payment provision in Gravel Products' letter was immediately objected to by Neshem. . . .

"Available evidence tends to indicate that Harley Neshem's testimony is supported by industry practice. Any contention in support of a contrary provision should be

viewed with caution.... I find that there was no meeting of the minds because of the substantial variance in time of proposed payment."

With regard to the specifications for the railroad ballast, Robin Funke, secretary-treasurer for Gravel Products, testified that the purpose of the September 9, 1980, telephone call "was to finalize the agreement on the ballast . . . ." At a subsequent point in his testimony, Funke testified, "Yes, we didn't go through that particular [railroad ballast] spec that evening." Gravel Products' September 12, 1980, letter to Neshem also indicates that the parties had not reached an agreement during the telephone conversation on the railroad ballast specification where it states: "the spec we would prefer for the Ballast is as follows: . . ."

 The trial court's determination in this case is based upon conflicting evidence, and we will not substitute our judgment for that of the trial court where there is evidence to support the trial court's findings. *Hirschkorn, supra; Gulden, supra.* That this Court might have viewed the facts differently had it been the initial trier of the case does not entitle this Court to reverse the lower court's determination. *Hirschkorn, supra; In Re Estate of Elmer,* 210 N.W.2d 815, 820 (N.D.1973). Having reviewed the entire record, we are not left with a firm conviction that the trial court was wrong in its finding that the parties did not mutually consent to enter a binding oral contract during the September 9, 1980, telephone conversation. The trial court's determination is supported by the evidence and is not clearly erroneous; therefore, it will not be set aside by this Court on appeal. In accordance with this opinion, the judgment of the district court is hereby affirmed.

VANDE WALLE, PEDERSON, SAND and PAULSON, JJ., concur.