William J. DEWEY, Sarah L. Dewey, and Daniel G. Dewey, Plaintiffs, Appellees and Cross–Appellants,

v.

Curtis M. LUTZ, Marvin D. Lutz, Paul A. Richter, and First State Bank of Regent, Defendants, Appellants and Cross–Appellees,

and

Stella M. Lutz and John Holm, Defendants.

Civ. No. 890185.

Supreme Court of North Dakota.

Oct. 2, 1990.

Greenwood, Greenwood & Greenwood, P.C., Dickinson, for plaintiffs, appellees, and cross-appellants; argued by Dann E. Greenwood. Appearance by Brenda L. Selinger, Dickinson.

Keogh Law Office, Dickinson, for defendants, appellants, and cross-appellees Curtis M. Lutz and Marvin D. Lutz; argued by Robert A. Keogh.

Wheeler Wolf, Bismarck, for defendant and appellant Paul A. Richter; argued by Albert A. Wolf, Bismarck.

Larry L. Boschee (argued) and Lawrence A. Dopson (no appearance) of Pearce & Durick, Bismarck; Gregory G. Gustin (no appearance), Federal Deposit Ins. Corp., Chicago, Ill.; and Gregory G. Gore (argued), Federal Deposit Ins. Corp., Washington, D.C., for Federal Deposit Ins. Corp., Receiver of First State Bank of Regent for appellant First State Bank of Regent.

MESCHKE, Justice.

Curtis Lutz, Marvin Lutz, Paul Richter, and First State Bank of Regent [Bank] appealed orders denying their post-trial motions and appealed the judgment on a jury verdict awarding William, Sarah, and Daniel Dewey actual and punitive damages for fraud and deceit. The Deweys cross appealed the rate of pre-judgment interest on their actual damages. We affirm.

The Deweys inherited an 800 acre farm in Slope County when their mother died in 1983. The farm had been leased to Marvin Lutz for several years. The Deweys retained attorney Peter Etzell in Mankato, Minnesota, to probate their mother's estate and he obtained an appraisal of $245,000 for the farm as of December 30, 1983. An addendum to the appraisal valued the farm at $209,000 as of June 30, 1984. The Deweys decided to sell the farm in early 1984 and contacted Marvin Lutz, who expressed an interest in buying it. The Deweys hired a Mankato realtor, Paul Butzer, to negotiate the sale to Marvin.

In August 1984 the Deweys and Marvin agreed to a purchase price of $210,000, and Marvin paid $1,500 earnest money. Marvin's inquiry at the Federal Land Bank about a loan to purchase the property was unsuccessful because Marvin was in poor financial condition and was going through bankruptcy. Marvin intended that his son, Curtis Lutz, then age 20 and attending college in Arizona, would own the land and farm it. But Curtis's application for a Federal Land Bank loan was also denied.

Marvin then approached Paul Richter, the president and majority owner of the Bank, about financing the purchase. The Lutzes had engaged in numerous financial transactions with Richter and the Bank in the past. At the time, Marvin and his wife, Stella Lutz, owed the Bank more than $200,000 and the Bank held a third mortgage on the Lutzes' Arizona condominium. Richter agreed to finance Curtis's down payment and so informed Butzer, the Deweys' realtor. Marvin told his attorney, John Holm, that Richter would be lending Curtis the down payment, and Holm prepared a memorandum agreement to that effect.

By early November 1984, the Deweys understood that Curtis would make a down payment of $97,000, less the $1,500 earnest money paid by Marvin, with the purchase price balance of $113,000 carried by the Deweys on a second mortgage. The Deweys agreed not to record the second mortgage until Curtis obtained financing to cover the down payment and until the lender recorded a first mortgage. Curtis's $113,000 promissory note to the Deweys was to be personally guaranteed by Marvin. In

addition, the Deweys understood that the total amount of the first mortgage and the second mortgage, together, could not exceed the $210,000 purchase price.

On November 6, 1984, Marvin and Richter met in Holm's office. After Holm expressed concern about the ability of Marvin and Curtis to pay for the land, Richter suggested that he purchase the property instead of Curtis, and that he lease the land back to Curtis with an option to purchase. Holm then changed the Lutz–Richter memorandum agreement to reflect that Richter would pay the $97,500 down payment rather than lend that amount to Curtis. The agreement also required Richter to obtain a loan to reimburse himself for the $97,500 down payment and to pay on various debts of the Lutzes. Holm neglected to change the agreement to reflect that the total purchase price of the land was $210,000.

At the conclusion of the meeting, Richter gave Holm a personal check for $97,500. Holm mailed a $95,500 check to Butzer to complete the down payment. The remaining $2,000 paid by Richter was given to Marvin. Holm prepared a warranty deed conveying the land from Curtis to Richter, and Marvin traveled to Arizona where Curtis signed the deed on November 13, 1984. This deed was returned to Holm. In the meantime, Etzell, unaware of the deal between Curtis and Richter, mailed Curtis the Deweys' second mortgage and promissory note for his signature. Curtis also signed that mortgage and note on November 13, 1984, and returned them to Etzell.

After receiving the signed deed conveying the land from the Deweys to Curtis, Holm forwarded that deed to Richter, along with the signed conveyance from Curtis to Richter, to be recorded "in the time frame and manner in which you feel is appropriate." Richter, on December 13, 1984, recorded the conveyance from the Deweys to Curtis after signing the consideration paragraph as Curtis's "agent" to certify that the full consideration was $210,000. At the same time, Richter recorded the conveyance from Curtis to himself.

Richter obtained a $172,000 loan from the Federal Land Bank and, in January 1985, deposited the proceeds of $159,500 with the Bank. Richter disbursed the funds as follows: $97,500 to reimburse himself for the November 6 down payment; $5,199.55 to pay fees for the Lutzes' Arizona condominium; $29,682.55 to an Arizona bank to reduce the first mortgage on the Lutzes' condominium; $20,800.45 to the West River State Bank in Hettinger, in which Richter held an interest, as payment on a promissory note from Marvin; and $5,317.45 to the Bank for interest due on a promissory note from Stella.

The Federal Land Bank mortgage securing the $172,000 loan to Richter was recorded on January 24, 1985. The Deweys' mortgage securing Curtis's $113,000 promissory note was not recorded until July 1985. The Deweys received no further payments from Curtis, Marvin, or Richter.

The Deweys sued Curtis, Marvin, Stella, Richter, the Bank, Butzer, Etzell, Holm, and the Federal Land Bank, alleging, among other things, that they had fraudulently schemed to deprive the Deweys of any security interest in their property. Richter and the Bank crossclaimed against the Lutzes, Butzer, and Holm. The Lutzes crossclaimed against Richter and the Bank. The trial court severed all crossclaims.

Prior to trial, the Federal Land Bank was dismissed from the action and the Deweys settled with Butzer. During the trial, the Deweys settled with Etzell. At the conclusion of the Deweys' case-in-chief, the trial court allowed the Deweys to amend their complaint to allege deceit in addition to fraud.

The jury returned a special verdict that Stella and Holm had not committed fraud or deceit and were not part of any fraudulent or deceitful scheme. The jury determined that Curtis had committed deceit; that Marvin and Richter had each committed fraud and deceit; and that Marvin, Richter, and the Bank had participated in a common scheme to defraud and deceive the Deweys. The jury found Curtis, Marvin, Richter, and the Bank jointly and severally liable to the Deweys for $113,000 in actual

damages and awarded interest at 10 percent. The jury also awarded the Deweys punitive damages of $3,300 against Curtis, $10,000 against Marvin, $25,000 against Richter, and $25,000 against the Bank. The trial court entered judgment on the jury verdict but reduced the actual damages by the amounts Deweys received from their settlements with Butzer and Etzell, and reduced the interest on that award to six percent.

Richter and the Bank moved for judgment notwithstanding the jury verdict, or in the alternative, for a new trial. The Lutzes also moved for a new trial. The trial court denied the motions. These appeals followed.

## AMENDMENT OF COMPLAINT

■ Curtis, Marvin, and Richter argue that the trial court abused its discretion in allowing the Deweys to amend their complaint during the trial to allege a cause of action for deceit. This issue was not raised by the appellants in their post-trial motions. In *Andrews v. O'Hearn*, 387 N.W.2d 716, 728 (N.D.1986), we said:

"It is well settled that where a motion for a new trial is made in the lower court the party making such a motion is limited on appeal to a review of the grounds presented to the trial court." *Zimbelman v. Lah*, 61 N.D. 65, 67, 237 N.W. 207, 208 (1931). This restriction of appealable issues applies not only to review of a denial of the motion for a new trial, but also to the review of the appeal from the judgment itself or from a denial of a motion for judgment notwithstanding the verdict.... [Footnote omitted.]

Because these appellants failed to raise this alleged error in their motions for a new trial and for judgment notwithstanding the verdict, we conclude that they waived the issue on appeal.

## SUFFICIENCY OF THE EVIDENCE

Curtis, Marvin, and Richter assert that the evidence was insufficient to support various "special findings of fact" by the jury. The challenged findings determined that Curtis committed deceit in the sale of the land to Richter "and his nondisclosure of the same to the" Deweys; that Marvin committed fraud and deceit in the execution and delivery to the Deweys of the promissory note and mortgage; that Richter committed fraud and deceit "in causing a mortgage to Federal Land Bank of St. Paul to be placed against the Dewey property and distributing the proceeds of the loan therefrom to the benefit of" Marvin and Stella; and that Marvin and Richter participated in a common scheme to defraud and deceive the Deweys.

■ Our review of questions of fact tried to a jury is limited to determining if there is substantial evidence to support the verdict. *City of Hazelton v. Daugherty*, 275 N.W.2d 624, 627 (N.D.1979). We view the evidence in the light most favorable to the verdict and it is only when reasonable people "can reach but one conclusion upon review of the issues that the evidence becomes a question of law for the court." *Vasichek v. Thorsen*, 271 N.W.2d 555, 558–559 (N.D.1978). Thus, unless the verdict is so flagrantly against the weight of the evidence that it appears the jury was actuated by bias, or prejudice, the verdict will not be set aside. *City of Hazelton v. Daugherty, supra.* There was substantial evidence in this case.

■ Marvin and Richter argue that there was no evidence to support findings of fraud on their part because they were not parties to the contract of sale of the property between the Deweys and Curtis. We have recognized that fraud and deceit are similar concepts. *Olson v. Fraase*, 421 N.W.2d 820, 827 n. 3 (N.D.1988). Technically, fraud under NDCC 9–03 applies only when there is a contract between the parties; deceit under NDCC 9–10 applies when there is no contract between the parties. *Hellman v. Thiele*, 413 N.W.2d 321, 326 (N.D.1987); *Ostlund Chemical Co. v. Norwest Bank*, 417 N.W.2d 833, 835–836 (N.D. 1988). Nevertheless, as pointed out long ago in *Beare v. Wright*, 14 N.D. 26, 103 N.W. 632, 634 (1905), conduct can be both fraudulent and deceitful.

We reject the argument that Marvin and Richter could not be liable for fraud be-

cause they were not parties to the contract. Marvin not only negotiated the terms of the agreement with the Deweys, but paid $1,500 as earnest money and personally guaranteed Curtis's $113,000 debt. Richter financed the transaction, signed the consideration paragraph in the conveyance from the Deweys to Curtis as Curtis's agent, and handled closing and recording the documents to complete the deal. Richter also directly informed Butzer, the Deweys' realtor, of his intention to finance Curtis's down payment. We believe that the evidence sufficiently showed that Marvin and Richter participated in the contract.

Moreover, even if Marvin and Richter were not parties to the contract, there is substantial evidence to support the jury's alternative findings of deceit. "One who willfully deceives another with intent to induce him to alter his position to his injury or risk is liable for any damage which he thereby suffers." NDCC 9–10–03. Deceit is defined in NDCC 9–10–02:

A deceit within the meaning of section 9–10–03 is:

1. The suggestion as a fact of that which is not true by one who does not believe it to be true;
2. The assertion as a fact of that which is not true by one who has no reasonable ground for believing it to be true;
3. The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or
4. A promise made without any intention of performing.

The jury was instructed concerning these statutory definitions.

Richter and Marvin argue that the only possible basis for deceit that the jury could have used was the suppression of a fact they were bound to disclose to the Deweys, and that, as a matter of law, they had no duty to disclose to the Deweys the nature of the actual transaction. We disagree.

Section 551 of the Restatement (Second) of Torts (1977) furnishes guidance in interpreting NDCC 9–10–02(3). *See Hellman v.*

*Thiele, supra.* Restatement section 551 says:

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

\* \* \* \* \* \*

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

\* \* \* \* \* \*

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

Through their activities in facilitating the sale of land from the Deweys to Curtis, Marvin and Richter were certainly "part[ies] to a business transaction" within the meaning of the Restatement provision. Marvin negotiated directly with the Deweys and led them to believe that Curtis would be the purchaser of their land. Richter led the Deweys to believe that his only involvement in the transaction would be as the lender for Curtis's down payment. Richter testified that during a telephone conversation with Butzer, the Deweys' realtor, one week before the November 6, 1984 meeting, Butzer "asked if I had the $97,000.00 for Curtis to buy the land. I said that I did." At the November 6 meeting Marvin and Richter decided that Richter would be the actual purchaser. This fact was not disclosed to the Deweys.

■ Once it was decided that Richter would purchase the land and obtain the first mortgage financing on it, Marvin and Richter had a duty to disclose these facts to the Deweys. Restatement section 551, subdivision 2(c), makes it clear that they had a duty to disclose subsequently acquired information they knew would make untrue or misleading their previous representations. *See also Ostlund Chemical Co. v. Norwest Bank, supra.* Subdivision 2(e) makes it clear that they had a duty to disclose facts basic to the transaction when they knew "the other [was] about to enter into it under a mistake as to them." The failure of Marvin and Richter to disclose important facts and information to the Deweys renders them liable for deceit.

■ For the same reasons, we believe that the jury's finding that Curtis committed deceit is supported by substantial evidence that he transferred the land to Richter and failed to disclose that fact to the Deweys. Curtis argues, as he did to the jury, that he was not involved in any of the negotiations, that he had no knowledge of the negotiations until they were concluded, and that he "was a young lad of 20 with no experience in real estate matters" who did only what Marvin and Richter instructed him to do. The jury heard this testimony but rejected it. We are in no position to second guess the jury on this finding.

■ The main contention of Curtis, Marvin, and Richter appears to be that there is insufficient evidence to establish an intention to defraud and deceive the Deweys. However, because intent to defraud and deceive is ordinarily not susceptible of direct proof, fraud and deceit may be inferred from the circumstances. *Miller Enterprises v. Dog N' Cat Pet Centers*, 447 N.W.2d 639, 644–645 (N.D.1989). There was evidence that Marvin and Richter met at Holm's office, before their November 6, 1984 meeting, and discussed the status of Marvin's debts, including the delinquencies on his Arizona condominium which was also subject to the Bank's third mortgage. They were concerned that if the condominium was lost to foreclosures, both the Bank, owned by Richter and his immediate family, and Marvin would be adversely affected. At the November 6 meeting, they agreed to effectively modify the deal between the Deweys and Curtis by having Richter purchase the land indirectly and obtain a loan sufficient to cover the down payment and to reduce the Lutzes' debts to banks in which Richter held an interest. They failed to disclose the change to the Deweys. Curtis, aware of the change that was made, also failed to disclose it to the Deweys. Richter obtained the excessive Federal Land Bank loan and disbursed the additional proceeds to benefit himself and the Lutzes. In the end, the Deweys were injured by this series of interrelated and undisclosed actions.

We conclude that the jury's special findings of fact, including the findings that Curtis committed deceit and that Marvin and Richter committed fraud and deceit and participated in a common scheme to defraud and deceive the Deweys, are supported by substantial evidence.

## JURY INSTRUCTIONS

■ Richter asserts that the trial court erred in its instructions on "scheme" because the court did not provide the jury "with any definition of a common scheme." The trial court instructed the jury:

A scheme is a design or plan formed to accomplish some purpose.

An act charged as fraudulent cannot be deemed affected by another act unless some connection between them is shown to exist. A requisite connection between acts appears when it is shown that the fraud charged and the fraud offered in evidence were either in a series of frauds committed by the person charged, although against different persons, or so closely connected in point of time, or otherwise, with the fraud charged, that it may be reasonably supposed that the motive or intention which prompted the two acts was the same.

Richter argues that this instruction was erroneous because it "dealt only with acts by a single person and not allegations of collective acts of the defendants."

When we review jury instructions on appeal, they "must be considered as a whole, and if, when so considered, they correctly advise the jury as to the law they are sufficient although parts of them standing alone may be erroneous or insufficient." *South v. National R.R. Passenger Corp.*, 290 N.W.2d 819, 825–826 (N.D.1980). In its instructions on the burden of proof and in explaining the respective claims, the trial court used phrases such as "Defendants acting collectively in a common scheme," thereby instructing the jury that the collective acts of the defendants could be considered. We believe the instructions, considered as a whole, fairly and adequately apprised the jury of the law on common scheme.

### ACTUAL DAMAGES

█ Curtis, Marvin, and Richter assert that the jury's award of $113,000 in actual damages is not supported by the evidence. They argue that, because the promissory note and mortgage do not require Curtis to pay the $113,000 balance to the Deweys until November 1, 1991, the jury's award of that amount is based on "speculation." We agree that uncertainty as to the fact of damage will prevent recovery of damages. *See Bergquist–Walker Real Estate v. Wm. Clairmont*, 333 N.W.2d 414, 420 (N.D. 1983). However, we do not agree that this jury's award was based on mere speculation.

The evidence showed that the Lutzes agreed with the Deweys that the total amount of the two mortgages placed against the land could not exceed the purchase price of $210,000. This restriction was violated when Curtis sold the land to Richter who recorded the first mortgage to the Federal Land Bank in the amount of $172,000. Richter testified that at the time of trial the land could not be sold for more than $168,000. Curtis, the mortgagor, who defaulted by failing to make any of the interest payments that were due on the note and second mortgage, did not own the property when the second mortgage was recorded. We believe that the jury could determine from this evidence that the Dew-

eys' second mortgage on the land was essentially valueless.

Our standard of review of an award of damages by a jury has been summarized:

In *Vallejo v. Jamestown College*, 244 N.W.2d 753, 759 (N.D.1976), this court stated:

"There is no certain or definite rule by which the amount of damages can be measured, and each case must be determined on its merits. This determination is in the province of the jury and the matter of damages rests largely in the sound discretion of the jury.

... Before this court will interfere with the verdict on appeal, it must be so excessive or so inadequate as to be without support in the evidence...." [Citations omitted.]

*Hoerr v. Northfield Foundry and Machine Co.*, 376 N.W.2d 323, 326 (N.D.1985). We conclude that the jury's award of actual damages was supported by substantial evidence.

### PUNITIVE DAMAGES

█ Curtis asserts that, because punitive damages can only be awarded under NDCC 32–03–07 "when the defendant has been guilty of oppression, fraud, or malice, actual or presumed," and the jury found only that he committed deceit, punitive damages were improperly assessed against him. We disagree.

The only significant distinction between the torts of fraud and deceit is whether the wrongdoer happens to be a party to a contract. *See Olson v. Fraase, supra*. The conduct prohibited under the separate statutory definitions of fraud and deceit is substantially identical. *See* 37 Am.Jur.2d *Fraud and Deceit* § 1, p. 20 (1968). We conclude that, for purposes of the punitive damages statute, fraud and deceit are synonymous.

Curtis, Marvin, and Richter assert that the jury's award of punitive damages was not supported by the evidence. Again, we disagree.

█ The jury found that Curtis committed deceit and that Marvin and Richter

committed fraud and deceit. These findings, which are supported by the evidence, supply bases for punitive damages. *See Olson v. Fraase,* 421 N.W.2d at 828. Punitive damages are excessive when the amount of the award is so great that it indicates passion or prejudice on the part of the jury. *Stoner v. Nash Finch, Inc.,* 446 N.W.2d 747, 754 (N.D.1989). Given the jury determinations of fraudulent and deceitful conduct in this case, the punitive damage awards of $3,300 against Curtis, $10,000 against Marvin, and $25,000 against Richter, are not excessive and are affirmed.

### BANK'S APPEAL

In February 1990, after these appeals were filed, the Federal Deposit Insurance Corporation [FDIC] was appointed as receiver of the Bank. The FDIC attempted to have the case removed to United States District Court, but that court remanded the case back to state court in an order dated April 5, 1990. The FDIC's appeal from that order is presently pending before the Eighth Circuit Court of Appeals.

■ The FDIC then moved in this court for a stay and alternatively for a partial remand to the trial court. The FDIC argued that this case should be stayed as a matter of federal law during the pendency of the FDIC's appeal to the Eighth Circuit Court of Appeals. We denied those motions on June 27, 1990. *See Olney Savings & Loan Association v. Trinity Banc Savings Association,* 885 F.2d 266 (5th Cir. 1989). We are not persuaded that the FDIC is entitled to a stay or a remand.

The Bank asserts that the trial court erred in submitting to the jury the question of its participation in a common scheme to commit fraud and deceit against the Deweys. The jury determined that the Bank participated in such a scheme, found it jointly and severally liable for the actual damages awarded, and assessed against it $25,000 in punitive damages.

The jury instruction on fraud in this case stated in part that "[f]raud must be intentional and cannot be imputed from an agent to his principal." The jury instruc-tion on deceit similarly stated that "[d]eceit must be intentional and cannot be imputed from an agent to his principal." The jury was also instructed that punitive damages could not be awarded unless a defendant "committed fraud or deceit and that he acted fraudulently or deceitfully as defined in these instructions." Because a corporation is an artificial being "which, by necessity, must act through its agents" [18 Am. Jur.2d *Corporations* § 1, at p. 799 (1985); *see also East Central Oklahoma Electric Coop., Inc. v. Oklahoma G. & E. Co.,* 505 P.2d 1324, 1327 (Okl.1973) ], these jury instructions tended to exempt the Bank from liability for fraud or deceit in this case.

■ However, in *McIntosh v. Dakota Trust Co.,* 52 N.D. 752, 204 N.W. 818 Syllabus 6 (1925), this court held:

A banking corporation is liable to innocent third persons where the representation is made in the course of its business and by an agent while acting within the general scope of his authority, even though, in the particular case, he is secretly abusing his authority and attempting to perpetrate a fraud upon his principal, or some other person, for his own ultimate benefit. In such a case, the bank is chargeable with the knowledge of its agents, and the exception to the rule of imputed knowledge does not apply.

*See also Emerado Farmers' Elevator Co. v. Farmers' Bank,* 20 N.D. 270, 127 N.W. 522 (1910); 18B Am.Jur.2d *Corporations* §§ 1680–1682 (1985). It is apparent that instructions that prohibited imputation of fraud and deceit from an agent to a principal were erroneous statements of the law.

In this case, Richter admitted that he and the Bank were "one." In addition, the Bank benfited from the fraudulent and deceitful scheme. Not only did the Bank directly receive part of the proceeds of the Federal Land Bank loan, but also the Bank's third mortgage position on the Lutzes' condominium was improved when almost $30,000 was paid on the first mortgage to an Arizona bank. Under these

facts, Richter's fraud and deceit could have been imputed to the Bank.

We recognize that none of the parties specifically objected to the trial court's instructions against imputing fraud and deceit from an agent to a principal. Generally, instructions made without objection become the law of the case. *Karst v. Vickers*, 444 N.W.2d 698, 700 (N.D.1989); *Bartholomay v. St. Thomas Lumber Company*, 148 N.W.2d 278, 292 (N.D.1966); *Montana–Dakota Utilities Company v. Culver*, 80 N.W.2d 541, 545 (N.D.1957); 75 Am.Jur.2d *Trial* § 927 (1974). However, we do not believe that a jury verdict, contrary to an erroneous instruction, must be reversed under all circumstances. Here, the erroneous instruction to which no objection was made in the trial court favored the party complaining on appeal. *See Jackson v. Scott County Milling Co.*, 118 S.W.2d 1054, 1057 (Mo.Ct.App.1938). It was not the favorable instruction that harmed the Bank; it was the unfavorable evidence.

"[I]t has been held that the mere fact that the jury disregarded an incorrect instruction is not a ground for reversing a judgment thereon, particularly where the verdict is plainly justified by the evidence, and it is manifest to the appellate court that justice has been done." 89 C.J.S. *Trial* § 510, at pp. 189–190 (1955) [Footnotes omitted]. *See also Walker v. Dickerson*, 183 Miss. 642, 184 So. 438, 439 (1938); *Kamo Electric Co-operative v. Earnest*, 277 S.W.2d 876, 879 (Mo.Ct.App.1955); *Bancroft v. Godwin*, 41 Wash. 253, 83 P. 189, 190 (1905). The court in *Jackson v. Scott County Milling Co., supra*, 118 S.W.2d at 1058, explained:

> [W]hile many cases state the rule to be that the court's instructions constitute the law of the case and that the jury is bound to follow them whether they are correct or incorrect we have been unable to find a case in which a new trial was granted or a verdict set aside when the jury brought in a proper verdict despite the court's erroneous direction. On the contrary the cases generally treat such verdicts and conduct as harmless error. *Roberts v. Wilson*, 225 Mo.App. 932, 33

S.W.2d 169; *Hill v. Gibson*, 107 Ark. 130, 154 S.W. 203; *Kruszczynski v. Hamler Boiler & Tank Co.*, 185 Ill.App. 428. To rule otherwise would be to reach the absurd result of convicting a jury of error when it had properly decided the case in accordance with the law and the facts. This matter is aptly covered in *Barnard v. Weaver et al.*, Mo. App., 224 S.W. 152, loc. cit. 154, where Judge Sturgis, speaking for this court said:

> "It is true, as plaintiff claims, that the jury did not strictly follow the instruction asked and given on behalf of plaintiff as to the finding on the counterclaim. In this the jury is not to be commended, though it acted more wisely than it knew. Had it followed those instructions, the cause must have been reversed for error therein. Shall the cause be reversed because the jury failed to follow erroneous instructions? We think not. * * * We are commanded not to reverse judgment, unless the error complained of materially affects the merits of the case against the complaining party. That the jury disregarded an instruction is error, because the jury is required to follow the law as declared by the court; but when such instruction is erroneous the disregard of same is not error prejudicing the rights of the complaining party."

Although the jury apparently disregarded the court's instructions on imputing fraud and deceit from agent to principal, the jury could properly find under the evidence and with correct guidance in the law that Richter acted as an agent of the Bank and that the Bank, through Richter, participated in a common scheme to commit fraud and deceit against the Deweys. The jury's failure to follow the erroneous instruction was harmless error. We therefore affirm the award of actual and punitive damages against the Bank.

## POST–TRIAL MOTIONS

Curtis, Marvin, Richter, and the Bank assert that the trial court abused its discretion in denying their motions for judgment notwithstanding the verdict and for a new

trial. In view of our disposition of the issues on the appeal from the judgment entered on the jury verdict, we cannot say that the trial court abused its discretion in denying the post-trial motions. *See Olmstead v. Miller*, 383 N.W.2d 817, 823 n. 5 (N.D.1986). We affirm denial of the post-trial motions.

### DEWEYS' CROSS APPEAL

 In their cross appeal, the Deweys assert that the trial court erred in reducing the rate of pre-judgment interest on the actual damage award from ten percent to six percent. They contend that the jury's award was justified because ten percent interest was the rate set forth in Curtis's original promissory note to them. *See Hirschkorn v. Severson*, 319 N.W.2d 475, 480 (N.D.1982); NDCC 32–03–04, 32–03–05, and 47–14–05. However, in this case the jury was instructed:

> If you return a verdict awarding damages to the Plaintiff, interest thereon at a rate not greater than six percent per annum from the date of the wrongdoing may be awarded in your discretion.

The Deweys did not specifically object to this instruction.

We believe that this instruction became the law of the case whether right or wrong. *See Karst v. Vickers, supra; Montana–Dakota Utilities Company v. Culver, supra*. Unlike the erroneous instruction on imputing fraud and deceit which favored the complaining party on appeal, *i.e.*, the Bank, [*supra* at p. 444], the allegedly erroneous instruction on interest did not favor the Deweys, who complain about it. It was the Deweys' duty to object to this unfavorable instruction in order to claim that it was erroneous on appeal. *See Bartholomay v. St. Thomas Lumber Company, supra*. We believe that their failure to object to this instruction makes applicable the general doctrine of the law of the case. We conclude that the trial court did not err in reducing the rate of pre-judgment interest awarded by the jury to the maximum rate authorized by the unchallenged instruction.

We have considered the other issues raised by the parties and deem them to be without merit. Accordingly, the judgment and post-trial orders are affirmed.

ERICKSTAD, C.J., LEVINE and VANDE WALLE, JJ., and VERNON R. PEDERSON, Surrogate Judge, concur.

VERNON R. PEDERSON, Surrogate Judge, sitting in place of GIERKE, J., disqualified.